**Lois LINQUIST and Alberta E. Burns, Plaintiffs,**

v.

**Otis R. BOWEN, Secretary of the Department of Health and Human Services, and United States Railroad Retirement Board, Defendants.**

**No. 80–0698–CV–W–9.**

United States District Court, W.D. Missouri, W.D.

Jan. 31, 1986.

As Amended June 18, 1986.

Jacqueline Guidry, Law Center for Senior Citizens, Johnny Lee Nixon, Legal Aid of Western Missouri, Kansas City, Mo., Gill Deford, Neal S. Dudovitz, Alfred J. Chiplin, Nat. Senior Citizens Law Center, Los Angeles, Cal., Eileen Sweeney, Nat. Senior Citizens Law Center, Washington, D.C., Alan F. Polack, Lakeshore Legal Services, Inc., Mt. Clemens, Mich., for plaintiffs.

Judy Strong, Asst. U.S. Atty., David M. Glass, Sheila Lieber, Dept. of Justice, Civil Div., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

BARTLETT, District Judge.

This case currently is pending on cross motions for summary judgment. Assuming that various procedural problems are resolved favorably to plaintiffs, this case presents the question whether plaintiffs who receive benefits under both the Social Security Act (SSA) and the Railroad Retirement Act (RRA) can have their benefits reduced by more than fifty percent of the amount their earned income in any year exceeds the exempt earnings amount. Plaintiffs state that during 1974 (Burns) and 1977 (Linquist) both the Secretary of the Department of Health, Education and Welfare in her capacity as Administrator of the Social Security Act (Secretary) and the Railroad Retirement Board (Board) reduced their benefits by fifty percent of their excess earnings resulting in a loss of $1 of benefits for every $1 in excess earnings. Plaintiffs argue that this dollar-for-dollar loss of benefits violates: 1) the intent of Congress; 2) the equal protection and due process clauses of the United States Constitution; and 3) the principles of equitable estoppel. Plaintiffs seek a determination that the Administration and the Board jointly can offset against benefits no more than fifty percent of plaintiffs' excess earnings.

## FACTS

In 1977 plaintiff Lois Linquist (Linquist) received survivor benefits under the RRA based on the work record of her deceased husband and primary benefits under the SSA based on her own work record.

During 1977 Linquist earned $3,415. Under both the SSA and RRA $3,000 was the amount of exempt earnings in 1977. Therefore, Linquist had $415 in excess earnings. On March 8, 1978, the Board notified Linquist that the Board had overpaid her $207 in 1977, approximately fifty percent of her excess earnings for 1977. Linquist was directed either to refund the overpayment to the Board or the overpayment would be recouped from her annuity benefits. One week after being notified of the overpayment, Linquist paid $207 to the Board. Linquist did not appeal the Board's action.

Approximately seven months later on October 11, 1978, the Secretary notified Linquist that her Social Security benefits had been overpaid $207 as a result of her excess earnings in 1977. Linquist was advised that $207 would be deducted from her Social Security benefits for November, 1978.

Having already repaid fifty percent of her excess earnings to the Board, Linquist administratively appealed the Secretary's determination that she was obligated to repay the remaining fifty percent of her excess earnings to Social Security. Linquist filed an extensive brief supporting her challenge to the Secretary's threatened action. The Administrative Law Judge (ALJ) refused to grant Linquist's request that the Secretary waive recovery of the overpayment, giving only cursory treatment to plaintiff's legal arguments.

On June 5, 1980, the Appeals Council concluded that there was no basis for reviewing the hearing decision. In its form order, the Appeals Council concluded that there was no error of law and there was no "broad policy or procedural issue which may affect the general public interest." Having exhausted all administrative remedies provided under the SSA, Linquist filed a complaint in this Court asserting that she should not have to repay the SSA the remaining fifty percent of her excess earnings after already having paid fifty percent to the Board.

The identical claims of Alberta E. Burns (Burns) arose differently. In 1974 Burns received primary benefits from Social Security based on her own work record and survivor benefits from the Board based on the work record of her deceased husband. During 1974 Burns also earned $3,800. In 1974 $2,400 was the amount of exempt earnings under both the SSA and RRA. Therefore, Burns' excess earnings for 1974 were $1,400.

On November 18, 1975, Burns was notified by Social Security that she had been overpaid by $744, approximately fifty percent of her 1974 excess earnings.[1] Social Security collected the overpayment by withholding Burns' benefits for January,

February and part of March 1976. Burns did not appeal administratively this action by Social Security.

On March 27, 1978, Burns was notified by the Board that her 1974 excess earnings had created a $700 overpayment in Railroad Retirement benefits. The Board recouped the $700 overpayment by suspending Burns' annuity benefits for four and one-half months beginning in June 1978. Because the $700 recoupment by the Board took the remaining fifty percent of Burns' 1974 excess earnings, she contested the Board's action under applicable administrative procedures. On December 11, 1980, the Board issued its final determination denying Burns' appeal.

On December 8, 1981, Burns was granted leave to intervene in this action. Burns also sought review of the Board's December 11, 1980, decision in the United States Court of Appeals for the District of Columbia. On February 25, 1983, the District of Columbia Court of Appeals rejected Burns' contention that the Board improperly recouped the remaining fifty percent of her excess earnings for 1974. *Burns v. United States Railroad Retirement Board,* 701 F.2d 193 (D.C.Cir.1983).[2]

## I. JURISDICTION

### A. *Exhaustion of Administrative Remedies*

There is no dispute that each plaintiff has exhausted the administrative remedies provided by the agency that offset against benefits the second fifty percent of each plaintiff's excess earnings. However, neither plaintiff has exhausted the administrative remedies of the agency that offset against benefits the first fifty percent of her excess earnings. For this reason, defendants argue that neither plaintiff has

---

**1.** The recoupment notice states that Burns had $3,888 in excess earnings rather than $3,800. Therefore, the benefit offset was $744 rather than $700. Administrative record at 35–36.

**2.** The District of Columbia Circuit Court of Appeals decided the issues presented by *Burns* in two separate opinions. The first *Burns* opinion,

*Burns v. United States Railroad Retirement Board,* 701 F.2d 189 (D.C.Cir.1983) (hereafter Burns (class)) decided the issue of class certification. The second *Burns* opinion, *Burns v. United States Railroad Retirement Board,* 701 F.2d 193 (D.C.Cir.1983) (hereafter Burns (merits)) decided the merits of the case.

exhausted available administrative remedies.

Both the SSA and RRA require exhaustion of administrative remedies before judicial review is sought. A person can obtain judicial review of a Social Security decision only after the Secretary has rendered a final decision. 42 U.S.C. § 405(g). Similarly, judicial review of Board decisions can occur only after all administrative remedies have been exhausted. 45 U.S.C. § 355(f).

In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court concluded that the claimant was not required to raise with the Secretary of Health, Education and Welfare his constitutional claim to a pretermination hearing before asserting it in federal court.

The fact that Eldridge failed to raise with the Secretary his constitutional claim to a pretermination hearing is not controlling. As construed in *Salfi*, § 405(g) requires only that there be a "final decision" by the Secretary with respect to the claim of entitlement to benefits. Indeed, the named appellees in *Salfi* did not present their constitutional claim to the Secretary. *Weinberger v. Salfi*, [422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522] O.T.1974, No. 74–214, App. 11, 17–21. The situation here is not identical to *Salfi*, for, while the Secretary had no power to amend the statute alleged to be unconstitutional in that case, he does have authority to determine the timing and content of the procedure challenged here. 42 V.S.C. § 405(a) [sic]. We do not, however, regard this difference as significant. It is unrealistic to expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context. The Secretary would not be required even to consider such a challenge.

. . . . .

Eldridge's constitutional challenge is entirely collateral to his substantive claim of entitlement.

*Id.* at 329–30, 96 S.Ct. at 900 [footnote omitted].

In *Jensen v. Schweiker*, 709 F.2d 1227 (8th Cir.1983), *appeal after remand sub nom. Jensen v. Heckler*, 766 F.2d 383 (8th Cir.1985), *cert. denied sub nom., Jensen v. Heckler*, —— U.S. ——, 106 S.Ct. 311, 88 L.Ed.2d 288 (1985), the Court relying on *Eldridge* concluded that Jensen was not barred from raising his constitutional challenge to a statute prohibiting payment of Social Security benefits to a person in prison on a felony conviction because the claim had not been raised before the Secretary.

This Circuit has followed *Eldridge* in holding that a federal court has jurisdiction to hear a challenge to a Social Security regulation under § 405(g) as long as the challenge is collateral to the substantive claim and presents a colorable constitutional claim. *Gipson v. Harris*, 633 F.2d 120, 122 (8th Cir.1980); *see Himmler v. Califano*, 611 F.2d 137, 148 (6th Cir.1979).

. . . . .

*Eldridge* requires a claim to be collateral to the substantive issue of entitlement and to present a colorable constitutional challenge. Whether a claim is collateral to the substantive claim of entitlement depends on whether the claim is unrelated to any controverted factual question of entitlement. Here, under § 423(f) Jensen is clearly not entitled to benefits. Further, there is no dispute that Jensen meets all other requirements of the Act and would, but for his incarceration, be receiving benefits. Like the situation in *Eldridge*, 424 U.S. at 331–32, 96 S.Ct. at 900–01, and unlike that in *Salfi*, 422 U.S. at 762, 95 S.Ct. at 2465, there was no reason besides the challenged statute for suspending benefits, and no alternative basis for continuing to provide benefits. We conclude that Jensen's claim is collateral to his substantive right to Social Security benefits.

*Id.* at 1229–30.

In *Finnerty v. Cowen*, 508 F.2d 979 (2nd Cir.1974), plaintiff received benefits under both the Social Security Act and the Rail-

road Retirement Act. As a result of excess earnings in 1970, first Social Security and then the Board took action to recoup overpaid benefits. Plaintiff challenged the double deduction from benefits of excess earnings by the Social Security Administration and by the Railroad Retirement Board. The district court dismissed the complaint for failure to exhaust and for lack of subject matter jurisdiction. The Court of Appeals held that it was error to dismiss Finnerty's complaint for failure to exhaust her administrative remedy. *Id.* at 983. Plaintiff argued that because her attack was on the procedure used by the Board (the second agency recouping overpaid benefits), she should not have to follow the administrative appeals procedure.

> According to appellant, the administrative process within the Railroad Retirement Board could not resolve whether these administrative procedures violated the Constitution or the relevant statute and regulations. Similarly, the agency itself could not declare unconstitutional those portions of the Railroad Retirement and Social Security Acts that allegedly discriminate against persons in Mrs. Finnerty's class. Thus, appellant argues, she was not required to pursue any administrative remedies.

*Id.* at 982.

The Court of Appeals agreed with plaintiff.

> We believe that appellant is correct. Federal agencies like the Board "have neither the power nor the competence to pass on the constitutionality of administrative or legislative action," [citations omitted] since the agency is not called upon to determine facts or to apply its expertise.

*Id.* [footnote omitted].

■ Here, as in *Eldridge* and *Jensen,* there is no risk of premature interruption of the administrative process which is the primary purpose of requiring exhaustion of administrative remedies. Both the Board and the Secretary had already developed the factual record and exercised their discretion on the question of entitlement to benefits; in fact, both plaintiffs were receiving benefits during the years in which they had excess earnings. Once the lawful formula for offsetting excess earnings against benefits has been determined, the amount of the deduction will not involve the exercise of administrative discretion. As demonstrated by *Jensen,* just because the outcome of this dispute may affect the amount of benefits does not mean that there is a substantive issue of entitlement to benefits. Therefore, the claims being asserted by plaintiffs are collateral to any substantive issue of entitlement to benefits.

Because the issues raised do not involve the determination of facts or the application of the defendants' administrative expertise, defendants lack the competence and experience to pass on them. Understandably, therefore, the legal issues presented by Linquist at the administrative level were given only the most summary treatment by the ALJ in his decision.

Furthermore, as the history of plaintiffs' claims demonstrates, exhaustion of the administrative remedies provided by both the Board and Secretary followed by effective judicial review is virtually impossible. Defendants do not coordinate the deduction of excess earnings. Therefore, the administrative and judicial review could well be completed for the first fifty percent deduction before the recipient would even know the second fifty percent is going to be claimed.

Finally, as demonstrated by the analysis that follows and by the majority and dissenting opinion in *Burns,* plaintiffs present colorable challenges to the legality of defendants' application of the excess earnings deduction.

■ For the foregoing reasons, to require exhaustion of administrative remedies would be both futile and unnecessary.

### B. *Mandamus*

Title 28 U.S.C. § 1361 provides that "[t]he district courts shall have original jurisdiction of any action in the nature of

mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

### 1. *Duty Owed to Plaintiffs*

Defendants argue that mandamus is inappropriate because plaintiffs cannot establish that either the Board or the Administration owed a clear ministerial duty to plaintiffs. Plaintiffs assert that the only dispute in this case is over the nature of defendants' duty to plaintiffs, i.e., whether defendants are constitutionally and statutorily obligated to allow plaintiffs to retain fifty percent of their excess earnings. Once the nature of defendants' duty is determined, the performance of that duty by defendants is absolute; they have no discretion to do other than the Constitution and statutes require.

■ In *Elliott v. Weinberger*, 564 F.2d 1219 (9th Cir.1977), *aff'd in part and rev'd in part on other grounds, sub nom. Califano v. Yamasaki*, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979), plaintiffs asserted that the procedures used by the Secretary in recouping excess payments violated their due process rights. The Secretary claimed that mandamus jurisdiction was not appropriate. In rejecting the Secretary's argument, the Court stated that mandamus is available even if there is a dispute about the nature of the legal duty. The essential element of mandamus jurisdiction is that once the duty is defined by the Court, the agency has no discretion in discharging that duty.

> Thus the trial courts properly found jurisdiction [pursuant to the federal mandamus statute, 28 U.S.C. § 1361]. Here we are concerned with the *duty* of the Secretary to provide certain minimum due process notice and hearing opportunities to Social Security recipients subject to recoupment [citations omitted]. It is a strict fifth amendment issue, and the question of discretion does not arise. The Secretary has either met his constitutional duty to provide a certain minimum, or he has not. He has no discre-

tion to provide less than that constitutionally required.

*Id.* at 1226.

■ Similarly, in *Belles v. Schweiker*, 720 F.2d 509 (8th Cir.1983), it was argued that mandamus jurisdiction was improper because the Secretary had no clear duty to act. In rejecting this argument, the Court observed that whether the Secretary had a clear duty to act "would entail an analysis of the merits of appellant's whole case." *Id.* at 513. Therefore, in order to determine whether mandamus jurisdiction is available, the allegations of the complaint are taken as true unless they are patently frivolous. Taking Belles' allegations as true that she was entitled to notice and hearing before overpayments were recouped, the Court affirmed the trial court's conclusion that it had jurisdiction under § 1361. *Id.*

■ Here taking the allegations of the complaint as true, the Secretary and the Board have a duty not to recover more than fifty percent of plaintiffs' excess earnings. Therefore, mandamus would lie to compel the Board and the Secretary to comply with their duty. As in *Elliott*, questions of Congressional intent and constitutional requirements are the essence of this dispute; questions of administrative discretion do not arise.

### 2. *42 U.S.C. § 405(h) Does Not Preclude Judicial Review Pursuant to 28 U.S.C. § 1361*

The Secretary argues that § 205(h) of the Social Security Act, 42 U.S.C. § 405(h), precludes § 1361 jurisdiction. Section 405(h) provides:

> The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recov-

er on any claim arising under this sub-chapter.

Even though the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), held that 42 U.S.C. § 405(h) precludes judicial review of administrative action on claims for Social Security benefits pursuant to federal question jurisdiction (28 U.S.C. § 1331), the Supreme Court has on at least three occasions left open the question of whether § 1361 jurisdiction was available. *Califano v. Yamasaki*, 442 U.S. 682, 698, 99 S.Ct. 2545, 2556, 61 L.Ed.2d 176 (1979); *Norton v. Mathews*, 427 U.S. 524, 529–30, 96 S.Ct. 2771, 2774–75, 49 L.Ed.2d 672 (1976); *Mathews v. Eldridge*, 424 U.S. 319, 332 n. 12, 96 S.Ct. 893, 901 n. 12, 47 L.Ed.2d 18 (1976).

However, other courts have recognized that mandamus jurisdiction is available to review procedures employed in administering the SSA. *Ellis v. Blum*, 643 F.2d 68 (2d Cir.1981); *Belles v. Schweiker*, 720 F.2d at 512; *Mental Health Ass'n of Minnesota v. Heckler*, 720 F.2d 965, 971 n. 17 (8th Cir.1983); *Lopez v. Heckler*, 725 F.2d 1489, 1507–08 (9th Cir.1984), *vacated on other grounds*, —— U.S. ——, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984).

In *Belles*, the Court concluded that § 405(h) does not preclude mandamus jurisdiction when plaintiffs' claims raise essentially a procedural challenge. *Belles*, 720 F.2d at 512. "A decision favorable to Belles would not entitle her to benefits, but would instead give her a right to notice and a prerecoupment hearing. Accordingly, § 405(h) is not controlling." *Id.* [footnote omitted]. Similarly, in *Mental Health Ass'n of Minnesota v. Heckler*, 720 F.2d at 971 n. 17, the Court relying on the "strength of the reasoning" in *Ellis* concluded that mandamus jurisdiction over the Secretary was appropriate where the claim raised was procedural in nature and where the district court's order did not infringe on the Secretary's delegated authority to make eligibility determinations.

As in *Ellis*, *Belles* and *Mental Health Ass'n of Minnesota*, this case also raises a procedural issue that does not affect the substantive question of entitlement to benefits. Both Linquist and Burns have already been found eligible for Social Security benefits. Therefore, § 405(h) does not preclude § 1361 mandamus jurisdiction over plaintiffs' claims against the Secretary.

## C. Jurisdiction in District Court Over the Railroad Retirement Board

Section 5(f) of the Railroad Unemployment Insurance Act,[3] 45 U.S.C. § 355(f), provides that the appropriate Court of Appeals shall review final decisions of the Board.

> Any claimant ... or any other party aggrieved by a final decision under subsection (c) of this section, may, only after all administrative remedies within the Board will have been availed of and exhausted, obtain a review of any final decision of the Board by filing a petition for review ... [in the appropriate federal court of appeals].

Defendants argue that where Congress has provided specific statutory review procedures those procedures are exclusive. Defendants rely primarily on *Denberg v. Railroad Retirement Board*, 696 F.2d 1193 (7th Cir.1983), *cert. denied*, 466 U.S. 926, 104 S.Ct. 1706, 80 L.Ed.2d 180 (1984). Denberg had been denied spouse's benefits under the Railroad Retirement Act and could have pursued an administrative appeal. Instead he brought suit in federal district court challenging the constitutionality of the different requirements for eligibility of husbands and wives for spouse's benefits under the RRA. The district court's conclusion that it had subject matter jurisdiction pursuant to 28 U.S.C. § 1337 (civil actions arising under Act of Congress regulating commerce) was the only question considered on appeal.

---

**3.** Section 5(f) of the Railroad Unemployment Insurance Act, 45 U.S.C. § 355(f), is incorporated by reference into the Railroad Retirement Act of 1974, 45 U.S.C. § 231(g).

The Court of Appeals noted that if § 1337 gives the district court jurisdiction, an applicant for retirement benefits under the Act can choose whether to exhaust administrative remedies and then seek review by a Court of Appeals or "forget about his remedies within the Board and go directly into a district court...." *Id.* at 1195. The Court concluded that "it is against common sense that a disappointed claimant should have a choice whether to seek judicial review in a district court with a right of appeal to the court of appeals, or in a court of appeals in the first place...." *Id.* at 1196.

Furthermore, the Court concluded that § 10(b) of the Administrative Procedure Act, 5 U.S.C. § 703, makes clear that the Court of Appeals is the proper forum for seeking review. Section 703 provides in part:

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction.

The Court then concluded that there was "no problem of 'absence or adequacy' of the special statutory review proceeding in ..." § 355(f). Therefore, the special statutory review proceeding in § 355(f) was exclusive. *Denberg,* 696 F.2d at 1196.

■ *Denberg* does not prohibit exercise of jurisdiction by this Court over the Board. First, *Denberg* was a dispute about entitlement to benefits, the type of dispute intended for initial administrative resolution. Here, as previously discussed, the dispute is not over entitlement to benefits. Second, the instant case is against both the Secretary and the Board while *Denberg* was against the Board only. If the result in *Denberg* were applied to this case, it would be impossible to get jurisdiction over the Secretary and the Board in the same forum because district courts are authorized to review final decisions of the Secretary while Courts of Appeals are authorized to review final decisions of the Board. The impossibility of obtaining simultaneous jurisdiction over the Secretary and the Board caused the District of Columbia Court of Appeals to conclude that "Congress did not intend to create a procedural conundrum of this kind." *Burns (class),* 701 F.2d at 192 n. 11. Therefore, the special statutory review proceeding in § 355(f) is inadequate in this situation. As a result, § 10(b) of the Administrative Procedure Act, 5 U.S.C. § 703, specifically excuses compliance with § 355(f).

Third, *Denberg* recognized the needless drain on judicial resources if disappointed benefit claimants could get review in the district court followed by review in the Court of Appeals. 696 F.2d at 1196. Here, however, the issues presented cannot be developed, presented and decided appropriately by the Board. For instance, the factual discovery utilized in this case in this Court is not readily available before the Board. Furthermore, deciding legal issues of the type involved in this case is not the proper function of the Board. *Finnerty,* 508 F.2d at 984. In addition, in *Burns (class),* 701 F.2d at 190, the Court stated that Burns' complaint might well have been appropriate for class adjudication had judicial review been commenced in the district court rather than the Court of Appeals. If this case had gone directly from the Board to the Court of Appeals, the appellate court would not have the benefit of the factual record developed in the trial court by all interested parties, particularly both agencies.

Finally, the Eighth Circuit has recognized implicitly an exception to the § 355(f) review procedure in similar situations. *See Yost v. Schweiker,* 545 F.Supp. 591 (D.S.D. 1982), *aff'd,* 699 F.2d 438 (8th Cir.1983) (the district court exercised jurisdiction over the Board to consider plaintiff's claim that certain procedures of the Social Security Administration and the Board violated plaintiff's constitutional rights). *See also Finnerty,* 508 F.2d at 984 (the Second Circuit

expressly approved the exercise of jurisdiction over the Board in this type of case).[4]

■ For the foregoing reasons, this Court has subject matter jurisdiction[5] pursuant to the mandamus statute, 28 U.S.C. § 1361.

## II. RES JUDICATA AND COLLATERAL ESTOPPEL BAR CERTAIN OF BURNS' CLAIMS

Under *res judicata,* a final judgment on the merits of an action precludes the parties from relitigating issues that were or could have been raised in that case. *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981); *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980).

■ In *Burns (merits),* 701 F.2d at 193, the statutory and equal protection claims asserted by Burns against the Railroad Retirement Board in the instant case were decided adversely to her. Furthermore, defendant Board argues and plaintiff Burns concedes that the other claims made against the Board here were available to her when she was pursuing judicial review in *Burns.* Therefore, all claims by Burns against the Board will be dismissed.

Defendant Secretary also argues that Burns should be collaterally estopped from asserting her statutory and equal protection claims against him. "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."

*Allen v. McCurry,* 449 U.S. at 94, 101 S.Ct. at 414; *Parklane Hoisery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

■ Collateral estoppel will preclude relitigation of an issue if: 1) the issue is identical to one that was present in a prior adjudication; 2) there was a final judgment on the merits as to that issue; 3) the estopped party was a party to the prior adjudication; and 4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue. *Oldham v. Pritchett,* 599 F.2d 274, 279 (8th Cir.1979). With respect to the Congressional intent and equal protection claims raised by Burns here against the Secretary, the four *Oldham* conditions listed are met. Plaintiff Burns agrees that these two claims against the Secretary should be dismissed.

Burns argues that she should not be estopped from raising in this action her due process and equitable estoppel claims against the Secretary. Defendants agree. Therefore, Burns will not be collaterally estopped from raising her due process and equitable estoppel claims against the Secretary in this action.

## III. CLASS CERTIFICATION

Plaintiffs seek certification of the following class pursuant to Rule 23, Federal Rules of Civil Procedure:

All persons who are receiving or who will receive both Social Security retirement benefits and Railroad Retirement benefits and who have been or will be denied the right to retain 50% of their excess earnings pursuant to the joint actions of

---

**4.** Defendants and *Denberg v. United States Railroad Retirement Board,* 696 F.2d 1193, 1197 (7th Cir.1983), suggest that *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) "demolished" the premise of the jurisdictional analysis in *Finnerty.* No express legislative prohibition exists in the Railroad Retirement Act to the exercise of federal jurisdiction over the Board decisions under § 1361 as the Supreme Court found in 28 U.S.C. § 1331. Section 10(b) of the Administrative Procedure Act, relied upon by *Denberg,* has an express exclusion for this type of case.

**5.** Jurisdiction also is asserted under 28 U.S.C. § 1337 (civil action arising under Act of Congress regulating commerce) and 28 U.S.C. § 1331 (federal question). Because of the presence of § 1361 jurisdiction, these alternative grounds for subject matter jurisdiction will not be analyzed. For the reasons stated in *Finnerty v. Cowen,* 508 F.2d 979, 983–84, (2nd Cir.1974), § 1337 also provides a basis for exercising jurisdiction.

the Social Security Administration and the Railroad Retirement Board.

Plaintiff Linquist's Motion to Certify Class, filed June 3, 1981, p. 2.

### A. Class Need Not be Restricted to People Who Have Exhausted Administrative Remedies

Defendants assert that the description of the proposed class is fatally deficient because there is no requirement that a person exhaust administrative remedies in order to be a class member. For the reasons already discussed, exhaustion of administrative remedies is not required when challenging an administrative policy and particularly when challenging the effect of an administrative policy applied by two independent agencies. The application of the excess earnings deduction will be precisely the same on each member of the class, i.e., each member of the class will have had monthly benefits reduced by more than fifty percent of excess earnings. Therefore, the class definition is not fatally defective for not requiring exhaustion of administrative remedies in order to be a class member.

### B. Numerosity

Under Rule 23(a)(1), the proposed class must be so numerous that joinder is impracticable. Defendants argue that the numerosity requirement has not been satisfied because the number of potential class members would be limited by the following factors: (1) most annuitants would not apply for both Social Security and Railroad Retirement benefits because they would enjoy no increase in benefits by doing so; (2) the earnings limitation does not apply to recipients over age 72; and (3) the sixty-day limitation in § 405(g) for seeking review of a final Social Security ruling would limit the number of people qualified to join the class.

The determination of whether a class is sufficiently large to make joinder impracticable must be made by the district court "in light of the particular circumstances of the case...." *Arkansas Ed. Ass'n v. Board of Education of the Portland, Arkansas School District,* 446 F.2d 763, 765 (8th Cir.1971).

A plaintiff need not specify an exact number of class members, but must show only that joinder is impracticable through "some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1038 (5th Cir.1981).

According to defendants' responses to plaintiffs' interrogatories, approximately 472,000 persons received benefits under both the RRA and the SSA. Of these 472,000, approximately 224,000 were under the age of 72 when the interrogatories were answered and approximately 150,000 were under the age of 70 as of January 1, 1982. (As of January 1, 1982, a beneficiary is exempt from the excess earnings deduction after age 70.) Furthermore, during 1977, approximately 152,000 Social Security recipients were required to forfeit benefits. (The Board has no comparable figures.) Neither the Board nor the Secretary keeps statistics showing the number of recipients subject to excess earnings deductions by both the Board and the Secretary.

The large number of double beneficiaries, together with the large number of Social Security recipients subject to the excess earnings deduction, furnish a reasonable basis for concluding that there is a sufficient number of double beneficiaries subjected to a double deduction of excess earnings to make joinder of each impractical.[6]

### C. Commonality

To satisfy the requirements of Rule 23(a)(2), there must be a question of

---

**6.** It is somewhat puzzling why the defendant Board is challenging the existence of a sufficient number of class members to make joinder impracticable in light of the Board's concession in its brief in *Burns* (dated April, 1982, at p. 38) that even under the Board's restrictive definition of eligible class members "the numerosity requirement is probably met."

either fact or law common to the class. In the instant case, the ultimate question is whether the defendants jointly may lawfully recoup more than fifty percent of the excess earnings from dual beneficiaries. This question is applicable to the class as a whole. Furthermore, the differences that exist in the factual background of each claim (most likely restricted to the amount of excess earnings and the amount of benefits) will not affect the outcome of the legal issue. *Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979). Therefore, the requirements of Rule 23(a)(2) are satisfied.

### D. *Typicality*

The claims of the representative party must be typical of the claims of the class. Rule 23(a)(3). Some courts have considered the typicality requirement of 23(a)(3) superfluous, equating it with the "adequacy" requirement of 23(a)(4) or the "common question" requirement of 23(a)(2). 3B Moore's Federal Practice, ¶ 23.06-2 (2d ed. 1982); *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982) (commonality and typicality requirements of Rule 23(a) tend to merge).

In *Donaldson v. Pillsbury,* 554 F.2d 825, 830 (8th Cir.1977), *cert. denied,* 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977), the Court stated that Rule 23(a)(3) requires "a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." Certainly the existence of plaintiff Burns demonstrates that plaintiff Linquist's claims are not unique.

In *Paskel v. Heckler,* 99 F.R.D. 80, 83–84 (E.D.Pa.1983), the Court differentiated between Rule 23(a)(2) and Rule 23(a)(3) as follows:

> Rule 23(a)(2) assures that there is a shared interest among the class in resolving a certain issue. Rule 23(a)(3) examines whether the named representative's particular claim presents that issue on behalf of the plaintiff class. The relative simplicity of the typicality requirement

may be summed up as follows: a plaintiff's claim is typical if it arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory.

Here, plaintiff Linquist's claims arise from precisely the same course of conduct that gives rise to the claims of class members, i.e., defendants' recoupment policies which result in the recoupment of $1 of benefits from every $1 of excess earnings of beneficiaries. Consequently, plaintiff Linquist's claims are typical of the claims of the other class members.

### E. *Adequacy of Representation*

Plaintiff Linquist must demonstrate that she will fairly and adequately protect the interests of the class. Rule 23(a)(4). This requirement is satisfied if: (1) there is no antagonistic interests between the named plaintiff and the class members, and (2) plaintiff's counsel are competent to conduct the litigation. *Sperry Rand Corp. v. Larson,* 554 F.2d 868, 873–74 n. 17 (8th Cir.1977), *aff'd on other grounds after remand, sub nom. Elliott v. Sperry Rand Corp.,* 680 F.2d 1225 (8th Cir.1982); *Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 247 (3d Cir.1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

Defendants assert that plaintiff Linquist cannot represent all beneficiaries of both the RRA and SSA whose benefits are subject to the excess earnings deduction because she failed to challenge administratively the Board's fifty percent recoupment of her 1977 excess earnings. As previously discussed, exhaustion of administrative remedies is not a prerequisite to class membership or to the assertion of plaintiff Linquist's claims in this Court. Furthermore, plaintiff Linquist is a dual beneficiary and both defendants asserted a fifty percent deduction for excess earnings against her. Therefore, she has no claim antagonistic to the interests of the class.

Plaintiff Linquist's counsel has had extensive experience in class action litigation. Eg. *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980), *reh'g denied,* 450 U.S. 960, 101 S.Ct. 1421, 67 L.Ed.2d 385 (1981). Defendants do not dispute the fact that plaintiff's counsel is competent to protect the interests of the class members.

### F. *Rule 23(b)(2) Requirements*

In addition to meeting all the requirements of Rule 23(a), a proposed class also must satisfy one of the alternative requirements of Rule 23(b). Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

Rule 23(b)(2) has been used as the basis for class certification in other cases challenging the policies or procedures of governmental agencies, including policies of the Social Security Administration and the Railroad Retirement Board. *United States Railroad Retirement Board v. Fritz,* 449 U.S. at 166, 101 S.Ct. at 453 (challenging the Board's failure to provide certain benefits to one class of railroad workers while providing them to other railroad workers); *Califano v. Yamasaki,* 442 U.S. at 682, 99 S.Ct. at 2545 (1979) (challenging the Secretary's refusal to grant the opportunity for an oral hearing before recoupment begins in overpayment cases); *Jimenez v. Weinberger,* 523 F.2d 689 (7th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976) (challenging the denial of Social Security benefits to certain illegitimate children); *Bermudez v. United States Dept. of Agriculture,* 490 F.2d 718 (D.C.Cir.1973), *cert. denied,* 414 U.S. 1104, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973) (challenging the Department's denial of retroactive food stamps to recipients whose benefits had been erroneously denied).

■ Here, defendants have acted towards plaintiff Linquist and all class members in precisely the same manner by asserting against each class member a policy of recouping jointly one hundred percent of excess earnings. Therefore, injunctive or corresponding declaratory relief applicable to the class would be appropriate.

### G. *Necessity for Class Certification*

Defendants argue that even though the Rule 23 requirements for class certification may have been satisfied, class certification is unnecessary because injunctive relief is requested.

■ If the requirements for class certification have been met, plaintiff Linquist is entitled to class certification. "[T]he Federal Rules of Civil Procedure give the proposed class representatives the right to have a class certified if the requirements of the rules are met." *United States Parole Commission v. Geraghty,* 445 U.S. 388, 403, 100 S.Ct. 1202, 1212, 63 L.Ed.2d 479 (1980).

If some further need for class certification were required, it is provided by the non-acquiescence policy of both the Board and the Secretary. In the past, the Secretary has refused to apply decisions in Social Security cases to any claimants except the claimant in the case.

> For several years now, the courts of this circuit have found themselves embroiled in an increasingly frustrating effort to persuade the Secretary to follow their decisions regarding certain legal standards under the disability insurance program. The Secretary, in an apparent effort to reduce the number of disability beneficiaries, has taken a more restrictive approach in recent years in determining eligibility. Often, the Secretary has stuck to this restrictive path even when it has led to direct contravention of federal court edicts. By proceeding in such a manner, the Secretary also has disregarded the fundamental policies at the heart of the disability program....

*Polaski v. Heckler,* 585 F.Supp. 1004, 1005 (D.Minn.1984), *aff'd,* 739 F.2d 1320 (8th Cir. 1984), *aff'd after remand,* 751 F.2d 943 (8th Cir.1984). *See also Levings v. Califano,* 604 F.2d 591 (8th Cir.1979) and *Holl-*

*ingsworth v. Schweiker,* No. N81–0035C (E.D.Mo. March 3, 1983) (after the Secretary's unilateral disavowal of *Levings,* a separate action had to be filed which resulted in class-wide relief from the date of *Levings* with the district court restating the obligation of administrative agencies to follow binding precedent). Further, the Secretary has stated that he will not follow district court decisions in other similar cases. For instance, in *Hillhouse v. Harris,* 547 F.Supp. 88, 92 (W.D.Ark.1982), *aff'd,* 715 F.2d 428 (8th Cir.1983), the Court quoted from the Appeals Council's decision in that case: "[T]he Secretary is bound only by the provisions of the Social Security Act, regulations and rulings, and by United States Supreme Court decisions. A district or circuit court decision is binding only in the specific case it decides...."[7] The Board also has refused to apply federal appellate court decisions to other cases raising the same issue of statutory application. See *Frock v. United States Railroad Retirement Board,* 685 F.2d 1041, 1043–44 (7th Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983).

The legal system cannot afford a "multiplicity of small individual suits for damages" and the aggrieved persons cannot economically obtain redress unless they employ the class action device. *Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980). Therefore, the aggregation of relatively small individual claims in this case where the class members will be the primary beneficiaries of any relief is not only authorized by Rule 23, but is precisely what the rule intended. *Id.; Califano v. Yamasaki,* 442 U.S. at 682, 99 S.Ct. at 2545.

Defendants also oppose class certification on the ground that the class would be nationwide in scope. Although the SSA and RRA contemplate case-by-case adjudication, certification of a class is appropriate where certification of a class action is otherwise permissible. *Califano v. Yamasaki,* 442 U.S. at 700, 99 S.Ct. at 2545.

We concede the force of the Secretary's contentions that nationwide class actions may have a detrimental effect by foreclosing adjudication by a number of different courts and judges, and of increasing, in certain cases, the pressures on this Court's docket. It often will be preferable to allow several courts to pass on a given class claim in order to gain the benefit of adjudication by different courts in different factual contexts. For this reason, a federal court when asked to certify a nationwide class should take care to ensure that nationwide relief is indeed appropriate in the case before it, and that certification of such a class would not improperly interfere with the litigation of similar issues in other judicial districts. But we decline to adopt the extreme position that such a class may never be certified.

*Id.* at 702–03, 99 S.Ct. at 2558. In this case, the same rules for recouping benefits as a result of excess earnings should apply regardless of where the dual beneficiary lives. Therefore, a class action presents an ideal method of assuring consistent treatment nationwide.

All requirements of Rule 23(a) and (b)(2), Federal Rules of Civil Procedure, having been satisfied, plaintiff Linquist's motion for class certification will be granted and the following class will be certified:

All persons who are receiving or will receive both Social Security retirement benefits and Railroad retirement benefits, and who have been or will be denied the right to retain fifty percent of their excess earnings pursuant to the joint ac-

---

**7.** The Secretary has filed an affidavit asserting that the Secretary has no policy of nonacquiescence because in "only 10" out of tens of thousands of court opinions since 1960 has the Secretary chosen to nonacquiesce in judicial opinions. Document No. 22, filed October 31, 1983. The Secretary's repeated failure to follow the decisions of this Circuit in disability determination cases is notorious. Because of the frequency and persistence of the Secretary's refusal to follow the settled law of this Circuit, the conclusion that a policy of nonacquiescence exists is justified regardless of the affidavit.

tions of the Social Security Administration and the Railroad Retirement Board.

■ When a class is certified pursuant to Rule 23(b)(2), Federal Rules of Civil Procedure, notice to the class members is not required. *Gibson v. Local 40, Supercargoes & Checkers,* 543 F.2d 1259, 1263 n. 2 (9th Cir.1976); *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122, 1125 (5th Cir.1969), *appealed on other grounds after remand,* 488 F.2d 714 (5th Cir.1974); A.R. Miller, "Problems of Giving Notice in Class Actions," 58 F.R.D. 313, 315 (1973). Therefore, without notice being sent to all class members, the Court will proceed to the merits.

## IV. MERITS [8]

The Railroad Retirement Act of 1974 [9] (RRA), provides for the payment of annuities to railroad employees and to certain dependents and survivors who have satisfied work-related requirements. 45 U.S.C. § 231a. The Social Security Act (SSA) provides similar benefits to eligible employees, spouses, children and other survivors. 42 U.S.C. §§ 401–433.

Both the RRA and the SSA provide for the reduction of benefits if a recipient has earnings that exceed a certain level in a year. The SSA provides that "[d]eductions ... shall be made from any payment or payments under this subchapter to which an individual is entitled, and from any payment or payments to which any other persons are entitled on the basis of such individual's wages ... if for such month he is charged with excess earnings, under the provisions of subsection (f) of this section...." 42 U.S.C. § 403(b). Title 42 U.S.C. § 403(f)(3), states that "an individual's excess earnings for a taxable year shall be 50 per centum of his earnings for such year in excess of [the exempt amount]." The excess earnings deduction

is limited to the amount of benefits payable under the SSA. 42 U.S.C. § 403(b). Thus, in 1977, Social Security recipients' benefits were reduced by fifty percent of their earnings over $3,000 [10] resulting in a $1 deduction in benefits for each $2 of excess earnings.

Since 1954, the RRA has incorporated by reference the excess earnings deduction provisions in the SSA. "Deductions ... shall be made from any payments to which a survivor is entitled under subsection (d) of this section until the total of such deductions equals such survivor's annuity under that subsection for any month, if for such month such survivor would be charged with excess earnings under section 203(f) of the Social Security Act...." 45 U.S.C. § 231a(g)(2). Therefore, under the RRA, there is a $1 deduction from benefits for each $2 of excess earnings.

Neither the SSA nor the RRA specifies how deductions for excess earnings are to be made if benefits are received by the same individual under both programs. Therefore, the Board and the Secretary each deduct from benefits fifty percent of the dual recipient's excess earnings. Consequently, a person receiving benefits under both Acts has fifty percent of her excess earnings deducted from Social Security benefits and fifty percent of her excess earnings deducted from Railroad Retirement benefits. As a result, the dual recipient has one hundred percent of excess earnings deducted from benefits up to the total amount of benefits received in any month.

Plaintiffs assert that a one hundred percent deduction of excess earnings violates the intent of Congress in reducing the excess earnings deduction from one hundred to fifty percent in 1972. Defendants respond that both the SSA and RRA clearly

---

**8.** To a large extent this section is based on the meticulously researched and persuasively written dissenting opinion of Circuit Judge, now Senior Circuit Judge, George E. MacKinnon in *Burns (merits),* 701 F.2d at 197 (MacKinnon, J., dissenting).

**9.** The Railroad Retirement Act of 1974 became effective on January 1, 1975. Pub.L. 93–445, 1974 U.S.Code Cong. & Ad.News 5702 (codified at 45 U.S.C. § 231 et seq.).

**10.** The amount of exempt earnings in 1974 was $2,400.

require a deduction of fifty percent of excess earnings and, therefore, there is no need to consult legislative intent.

■ The function of this Court in interpreting statutes "is to construe the language so as to give effect to the intent of Congress." *United States v. America Trucking Ass'ns*, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). Although there is no invariable rule for the discovery of Congress' intention,

> To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute, particularly in a law drawn to meet many needs of a major occupation.
>
> There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination."

*Id.* at 542–44, 60 S.Ct. at 1063–64.

■ Courts should be wary of adopting a literal interpretation of a statute without considering extrinsic aids to the construction such as legislative history. "[O]nce the tyranny of literalness is rejected, all relevant considerations for giving a rational content to the words become operative." *United States v. Witkovich*, 353 U.S. 194, 199, 77 S.Ct. 779, 782, 1 L.Ed.2d 765 (1957). Frequently, the literal interpretation of a statute appears reasonable in isolation but is revealed as unreasonable when examined in light of legislative history. E.g., *Perry v. Commerce Loan Co.*, 383 U.S. 392, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966); *Church of the Holy Trinity v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892); *General Serv. Employee Union Local 73 v. NLRB*, 578 F.2d 361, 366 (D.C.Cir.1978); *Hodgson v. Board of County Commissioners, County of Hennepin*, 614 F.2d 601, 612 (8th Cir.1980) (where the Court concluded that application of a statute's literal meaning would be "out of harmony" with the basic policy of the statutory scheme.)

Here, Congress has not stated in either the SSA or the RRA how the excess earnings deduction should be applied to individuals receiving benefits under both Acts. For reasons that will be discussed later, there is sufficient doubt that Congress intended a $1 deduction from benefits for every $1 of excess earnings that resort to legislative history to determine the intent of Congress is warranted. *See Cass v. United States*, 417 U.S. 72, 77, 94 S.Ct. 2167, 2170, 40 L.Ed.2d 668 (1974).

Prior to 1972, both the SSA and the RRA required that for every $1 of excess earnings $1 in benefits would be deducted. In 1972, Congress amended the excess earnings provision in the SSA by changing the $1 deduction from benefits for each $1 of excess earnings to a $1 deduction from benefits for every $2 of excess earnings. Pub.L. 92–603, §§ 105(a)(3), 106(a), 1972 U.S.Code Cong. & Ad.News 4989 (codified at 42 U.S.C. § 403(f)(3)).

"The evidence is indeed 'overwhelming' that Congress reduced the offset to encourage social security beneficiaries to work." *Burns (merits)*, 701 F.2d at 196. For instance, in his Message to Congress Transmitting Proposals for Welfare Reform and Social Security Amendments, President Nixon stated:

> A feature of the present social security law that has drawn much criticism is the so-called "retirement test," a provision which limits the amount that a beneficiary can earn and still receive full benefits.... *The present retirement test actually penalizes social security beneficiaries for doing additional work or taking a job at higher pay. This is wrong.*
>
> In my view, many older people should be encouraged to work. Not only are they provided with added income, but the country retains the benefit of their skill and wisdom; they, in turn, have the feeling of usefulness and participation which employment can provide.

*Burns (merits)*, 701 F.2d at 209 n. 16 (Mac-Kinnon, J., dissenting) (quoting the President's Message to Congress Transmitting Proposals for Welfare Reform and Social Security Amendments (September 25, 1969)).

· The Undersecretary of Health, Education and Welfare testified before Congress in part as follows:

[T]he really basic structural reform that we are proposing is that the dollar-for-dollar adjustment be dropped and that there be *no point where more than a dollar in benefits is taken away for each $2 that an individual earns, so that the present situation, where an individual ... will find that he is actually losing by earning more, will no longer exist.* Under present law a person loses because he has expenses of working and he has to pay income taxes.... So he can lose by taking a job....

*Burns*, 701 F.2d at 210 n. 18 (MacKinnon, J., dissenting) (quoting the Social Security and Welfare Proposals: Hearings before the House Committee on Ways and Means, 91st Cong., 1st Sess. 155 (1969)).

The House Report accompanying the 1972 amendments stated in part:

[Y]our committee believes that the American people do not want a system which results in promoting welfare as a way of life. Your committee's deliberations, therefore, have been aimed toward providing adequate assistance to those who cannot help themselves, while at the same time *creating a system of assistance which will maximize the incentive and the obligation of those who are able to work to help themselves.*

H.R.Rep. No. 231, 92nd Cong., 1st Sess. 2 (1971), 1972 U.S.Code Cong & Ad.News 4990. Reducing the deduction for excess earnings would encourage social security beneficiaries to work because they would have more spendable income. "This change would assure that the more a beneficiary works and earns, the more spendable income (that is, social security benefits plus earnings after taxes) he will have." H.R.Rep. 231, 92nd Cong., 1st Sess. 49 (1971), 1972 U.S.Code Cong. & Ad.News 5036.

The Senate also intended by amending the excess earnings deduction to encourage beneficiaries to work. "The committee agrees with the President that *work should be rewarded and its value to the worker increased....* A number of ... provisions [including the excess earnings provision] are included in the committee bill which reflects the committee's aim of *increasing the benefits of working.*" S.Rep. No. 1230, 92nd Cong., 2d Sess. 28 (1972). The Senate report concluded that "there would be no $1-for-$1 reduction [in benefits] as under present law." *Id.*

Congress also thought that by increasing the incentive to work, more retired persons would generate excess earnings thereby reducing the drain on the finite public funds available to administer Social Security. *See* H.R.Rep. No. 231, 92nd Cong., 1st Sess. (1971); S.Rep. No. 1230, 92nd Cong., 2d Sess. (1972); *Burns (merits)*, 701 F.2d at 210 (MacKinnon, J., dissenting).

■ Because Congress so explicitly intended to reduce the excess earnings deduction in order to provide an incentive for beneficiaries to work, the defendants' literal application of the excess earnings provisions in the SSA and RRA to dual beneficiaries must be rejected. The defendants' approach results in a $1 deduction from benefits for every $1 of excess earnings, which is the very formula Congress rejected in 1972. No legislative history or statutory provision suggests that Congress intended to encourage single beneficiaries to work but did not intend to encourage double beneficiaries to work.[11]

In *Freeman v. Harris*, 625 F.2d 1303 (5th Cir.1980), the issue was whether the Secretary of Health, Education and Welfare's practice of offsetting both social security disability payments and black lung benefits against state workers' compensation payments was contrary to the intent of Congress. Both federal programs authorized the Secretary to reduce benefits if a recipient received state workers' compensation benefits. The Secretary applied both acts literally and reduced a recipient's workers' compensation benefits under both federal acts. Therefore, plaintiff received less benefits under the three programs

---

**11.** The most reasonable conclusion is that Congress never contemplated the effect of the excess earnings deduction on dual beneficiaries. Courts frequently must apply statutes to situations that were not contemplated by the legisla-

tive branch. *Cass v. United States*, 417 U.S. 72, 83, 94 S.Ct. 2167, 2173, 40 L.Ed.2d 668; *Church of the Holy Trinity v. United States*, 143 U.S. 457, 472, 12 S.Ct. 511, 36 L.Ed. 226 (1892); *Freeman v. Harris*, 625 F.2d 1303, 1307 (5th Cir.1980).

than he would have had he not applied for workers' compensation at all.

█ The primary purpose of both federal programs was income replacement for the disabled worker. However, the offset provision in both federal acts were also designed to avoid overreplacement of a disabled worker's prior income and to ensure that a state's workers' compensation program was the primary provider.

We agree that the programs have twin goals and that, as far as possible, the law should be interpreted to carry out these goals. In this instance, however, both goals cannot be achieved. In essence, then, we are seeking to determine the intent of Congress as applied to a factual situation which obviously it did not foresee.

*Id.* at 1307.

The Court then concluded that the Secretary's double offset policy "contravenes congressional intent."

It is undeniable that the effect of the double offset is to discourage a miner from pursuing workers' compensation, and thus to encourage the miners to rely exclusively on the federal government for compensation. This result is clearly at odds with a prime Congressional intent of making state workers' compensation the program to which citizens should turn first for disability compensation.

*Id.* at 1308.

In order to allow the two federal programs "to operate in concert consistently with Congressional intent ..." the Court ordered the Secretary to offset the benefits from the federal programs against workers compensation benefits so that the total offset did not exceed one hundred percent of the workers compensation benefits. *Id.* at 1309.

In the instant case, the argument for rejecting the Board and the Secretary's policy of offsetting one hundred percent of excess earnings against benefits is stronger than in *Freeman.* There, the Secretary's policy at least promoted one congressional goal, i.e., overreplacement of workers' prior income. Here, the defendants have not identified any Congressional purpose underlying the 1972 amendment to the excess earnings deduction that is advanced by the literal application of the excess earnings deduction to dual beneficiaries.

Defendants rely on the majority decision in *Burns (merits),* 701 F.2d at 197 where the Court reached the opposite result from this case.

It is treacherous to brush aside the literal meaning of those provisions and, by riveting attention on work incentive, avoid forthright recognition of another concern on the mind of Congress. That concern relates to the appropriateness of allowing a retiree to collect two federal social insurance benefits.

Because of Congress' "ambivalence ... regarding allowance of dual benefits and the legislature's ultimate rejection of them ...", the *Burns* court did not want to guess how Congress would have reacted had it explicitly faced the application of excess earnings offsets to dual beneficiaries. *Id.* at 197. "Congress might well have considered a double offset a fitting match for a double benefit." *Id.* at 198. "In sum, while the wisdom of a dual or dollar-for-dollar offset is indeed debatable, 'we think it clear that Congress could rationally choose to adopt such a course.'" *Id.* (quoting from *Weinberger v. Salfi,* 422 U.S. at 81, 95 S.Ct. at 2474).

█ Even if dual beneficiaries received a one hundred percent increase in benefits over a single beneficiary (which they do not),[12] it is difficult to see the rationality of

12. In 1977, plaintiff received approximately $4,204 in benefits from both the SSA and RRA. According to defendant Board's answers to plaintiff's Supplemental Interrogatories, this is less than she would have received if her earnings and her husband's had been covered under the Railroad Retirement Act. Furthermore, the total benefits plaintiff received in 1977 under both acts is only slightly more than she would have received if her earnings and her husband's had been covered under the SSA. See letter from Department of Justice attorney Seaman attached as Exhibit B to plaintiff's Motion for Summary Judgment, filed July 24, 1981.

Furthermore, according to the Board's brief in *Burns,* only forty-two percent of widow annuitants receiving dual benefits receive a dual benefit component. Without this component, a dual beneficiary receives no extra income because one benefit is offset by the other. Therefore, fifty-eight percent of the widow annuitants receiving dual benefits do not receive more benefits under both programs than they would under one.

In addition, the Board's response to Interrogatory No. 16 filed on February 20, 1981, states that a survivor collecting benefits under both programs would receive a maximum of thirty

the *Burns* analysis. To conclude that Congress would have wanted to discourage double beneficiaries from working produces precisely the result Congress so explicitly disavowed, i.e., a dollar-for-dollar offset. For the dual beneficiary, the dollar-for-dollar offset has the same effect as on a single beneficiary; the incentive to work is reduced.[13] Without an incentive to work and thereby generate excess income, the dual beneficiary would be even less likely than the single beneficiary to generate the excess earnings that would reduce the burden on the finite funds available to pay benefits. Congress' unequivocal intent to encourage Social Security recipients to work must be effectuated rather than some hypothetical Congressional purpose that produces a result at odds with Congress' unequivocal intent. *See Freeman*, 625 F.2d at 1308.

Therefore, in order to effectuate Congress' desire to encourage recipients to work, the Board and the Secretary will be required to coordinate the reduction of benefits for excess earnings so that recipients lose no more than $1 of benefits for each $2 of excess earnings. Then, and only then, will dual beneficiaries have the incentive to work Congress intended in 1972.

Having concluded that the defendants' joint application of the excess earnings deduction to persons receiving benefits under both the Social Security Act and the Railroad Retirement Act violates the intent of Congress, it is unnecessary to determine whether plaintiffs Linquist's constitutional rights also are violated. Plaintiff Burns' allegations that defendants' actions violate her due process rights and the principles of equitable estoppel are not addressed because plaintiff Burns falls within the class definition and, therefore, is entitled to the class relief.

## ORDER

Therefore, it is ORDERED that:

1) intervening plaintiff Burns' claims against defendant Railroad Retirement Board are hereby dismissed;

2) intervening plaintiff Burns' claim that the Railroad Retirement Board violated her right to equal protection and contravened Congressional intent by duplicating the Secretary's recoupment of fifty percent of a benefit recipient's earnings over the exempt amount is hereby dismissed;

3) plaintiff Linquist's motion for class certification is granted and the following class is hereby certified:

All persons who are receiving or who will receive both Social Security retirement benefits and Railroad retirement benefits, and who have been or will be denied the right to retain fifty percent of their earnings over the exempt amount pursuant to the joint actions of the Social Security Administration and the Railroad Retirement Board;

4) defendants' policy of jointly deducting from total benefits under the Social Security Act and the Railroad Retirement Act more than fifty percent of a dual beneficiary's earnings over the exempt amount violates the intent of Congress to limit the excess earnings deduction to fifty percent;

5) the Railroad Retirement Board and the Secretary shall coordinate their application of the excess earnings deduction so that every class member may retain fifty percent of his or her earnings over the exempt amount;

6) defendants shall immediately take whatever steps are necessary to change their policies on the deduction of earnings over the exempt amount to conform to this Order. This policy change shall be disseminated in the same manner as other policy changes except dissemination shall occur at the earliest possible time;

7) defendant Railroad Retirement Board shall immediately commence processing, analyzing and granting relief consistent with this Order to all people presently identified or who in the future will be identified as class members. As soon as possible both prospective and retrospective relief should be granted to this group by both the

percent more than he or she would under only one program. Therefore, dual beneficiaries do not receive a one hundred percent increase in benefits over single beneficiaries. How a double offset for excess earnings rationally responds to these facts is unexplained in *Burns (merits)*.

13. See Linquist's testimony that she would have worked less if she had known that she would have all of her excess earnings set off against benefits. Administrative record at 82.

Railroad Retirement Board and the Secretary. The Secretary shall give priority attention to cooperating with the Railroad Retirement Board in affording this group immediate relief consistent with this Order;

8) defendant Secretary shall begin immediately to implement the computer program changes necessary to identify all current and past beneficiaries subject to the unlawful offset policy. Prospective relief should be granted to a beneficiary immediately upon identification and in no event later than the month next after the month in which a class member is identified. Absent compelling circumstances, retrospective relief should be granted no later than the month next after the month in which the class member is identified;

9) unless changed by a subsequent order, full implementation of this Order, including payment of all retrospective amounts due, shall occur on or before January 22, 1987;

10) every thirty days, the defendants shall report to the Court and to counsel for the plaintiffs their progress in complying with paragraphs 7) and 8). These reports should be furnished on or before the 22nd day of each month commencing June 22, 1986;

11) during the pendency of any appeal from this Order or from the January 13, 1986, Order, every class member receiving any relief under this Order shall be notified that relief has been granted pursuant to these Orders, that these Orders are being appealed by the defendants, and if reversed, the defendants will seek recoupment. The wording of this notice should be approved by plaintiffs' counsel; and

12) costs of this action are assessed against defendants.